```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY


                                :
LAWRENCE E. SARLO,              :
                                :
          Plaintiff,            :      HONORABLE JOSEPH E. IRENAS
                                :      CIVIL ACTION NO. 04-6003
     v.                         :
                                :            OPINION
BROADSPIRE SERVICES, INC.       :
and LUMBERMAN'S MUTUAL          :
CASUALTY COMPANY,               :
                                :
          Defendants.           :
```

**APPEARANCES:**

HAGNER & ZOHLMAN, LLC
By:  Thomas J. Hagner, Esq.
1820 Chapel Ave. West, Suite 160
Cherry Hill, New Jersey 08002
          Counsel for Plaintiff

McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
By:  Louis P. DiGiaimo, Esq.
1300 Mount Kemble Ave., P.O. Box 2075
Morristown, New Jersey 07962
          Counsel for Defendants


**IRENAS,** Senior District Judge:

     In this ERISA action, Plaintiff Lawrence Sarlo ("Sarlo")

seeks disability benefits to which he asserts he is entitled

under his Long Term Disability ("LTD") insurance provided by

Defendant Lumberman's Mutual Casualty Company.[1]  Defendant

Broadspire Services, Inc., is the claims administrator.[2]  Before

---

     [1] Lumberman's Mutual Casualty Company's trade name is Kemper Insurance
Companies.

     [2] The parties refer to Lumberman's Mutual Casualty Company and
Broadspire Services, Inc., collectively as "Broadspire."  Accordingly, the
Court will do the same.

the Court are the parties' cross-motions for summary judgment.[3]

## I.

Sarlo suffered a serious head injury during a car accident on July 6, 2001.  At the time, he was employed by Cellco Partnership d/b/a Verizon Wireless ("Verizon") as a sales representative.  A few days after the accident, Sarlo began receiving short-term disability benefits.

On November 30, 2001, Broadspire wrote to Sarlo recommending that he begin the application process for LTD benefits.  The letter enclosed the requisite LTD forms, including an "LTD Plan Benefit Application" and an "LTD Questionnaire."  (Def. Ex. B at SAR000004)  Sarlo completed and signed the forms on December 12, 2001.  His LTD Plan Benefit Application indicated that his injury was "nerve damage to spine, neck and back injuries; brain injury; post-concussion syndrome with cognitive changes; lumbar radiculopathy, upper abdominal wall contusion, cervical dorsal sprain / strain, osteochondral injury of right hand."  (Id. at SAR000005)  In response to the question, "why are you unable to work?" Sarlo wrote, "speech, decision making, concentration, memory loss, constant pain in lower back, legs and arms, headaches."  (Id.)  In his initial application, Sarlo also

---

[3]  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

identified (with contact information) the following medical
providers who had treated him for his disability: Dr. Langanella
(occupational injury); Dr. Patil (neurologist); Dr. Einhorn (eye
therapist); Lisa Cohen (speech and cognitive therapist); "Mark"
(physical therapy); Dr. Lazarus (neuropsychologist); and Dr.
Bornfriend (psychologist).  (Id. at SAR000012)

Sarlo's LTD policy defines "disability" as:

> our determination that a significant change in your
> physical or mental condition due to:
>
> 1.  Accidental injury
>
> . . .
>
> began on or after your Coverage Effective Date and
> prevents you from performing, during the Benefit
> Qualifying Period and the following 24 months, the
> Essential Functions of your Regular Occupation or of
> a reasonable Employment Option offered to you, and
> as a result you are unable to earn more than 80% of
> your Pre-disability Monthly Income.
>
> After that, you must be so prevented from performing
> the Essential Functions of any Gainful Occupation
> that your training, education and experience would
> allow you to perform.

(Def. Ex. A at 000365-366) Thus, the policy contains two
different definitions of disability: one that applies during the
first two years of LTD; and another that applies thereafter.  The
policy makes clear that it is the claimant's responsibility to
provide proof of a qualifying disability.  (Id. at 000370)

In early January, 2002, Broadspire determined that Sarlo was
entitled to LTD benefits, effective January 7, 2002.  Shortly

3

thereafter, Broadspire advised Sarlo by letter that "it appears that you are currently disabled from performing the duties of your regular job," and further informed him, "if your disability should extend to the 24 months [referenced in the policy's definition of "disability"], we will reevaluate your claim for total disability." (Def. Ex. B at SAR000023)  Finally, the letter stated, "[t]o remain eligible for continued benefits under the Long Term Disability Plan, it is necessary for you to be under the continuous care of a legally qualified physician. Periodically, we will request updated information about your medical condition."  (Id.)

Accordingly, Sarlo was paid LTD benefits for the initial two year period, January 7, 2002, through January 7, 2004.  During this time, Broadspire several times contacted Dr. Langanella, Sarlo's attending physician and Ms. Cohen, Sarlo's speech-language pathologist, requesting current information, including a description of any significant changes in Sarlo's medical status. Both health care providers stated that Sarlo was having "cognitive problems," including self-reported memory and concentration difficulties.  Dr. Langanella's prognosis was "guarded."  Ms. Cohen's prognosis was "fair."[4]

As the end of the initial two year period approached, in

---

[4]  Also during this time, Sarlo successfully applied for Social Security Disability benefits.  In accordance with the terms of Sarlo's policy, his LTD benefit payments were reduced by the amount of his Social Security award.

June 2003, Broadspire again wrote to Sarlo to advise him that payments under the first disability definition were to expire on January 7, 2004.  Quoting the policy language, the letter advised that after January 7, 2004, Sarlo must be "'so prevented from performing the Essential Functions of any Gainful Occupation that [his] training, education, or experience would allow you to perform.'" (Id. at SAR000235)

In a separate letter bearing the same date, Broadspire asked Sarlo to complete the enclosed "Long Term Disability Questionnaire" and "Physician Update Form" and to return the paperwork by July 19, 2003.  Broadspire stated that the "updated information" was required "in order to certify your continued eligibility for benefits."  (Id. at SAR000236)  On the questionnaire, Sarlo indicated that the health care providers he saw regularly were: Dr. Patil (neurology); Dr. Langanella (physician); Ms. Cohen (speech-language pathologist); Dr. Carberry (psychologist); and Dr. Rubin (psychiatrist).  (Id. at SAR000238-239).  The questionnaire also asked: "Describe in your own words what prevents you from performing YOUR occupation" and "what prevents you from engaging in ANY gainful employment." (Id. at SAR000238) Sarlo answered, "memory and concentration problems" to both.  (Id.)  Other than filling in his name and address, Sarlo did not complete the Physician Update Form, which asked for the names and contact information of the physicians

currently treating him.  (Id. at SAR000242)

At the beginning of August, 2003, Broadspire asked Dr. Carberry and Dr. Rubin to complete "Behavioral Health Clinician Statements," specifically asking in bold font, "[p]lease include all current objective medical documentation including all office and/or chart notes, and the results of any diagnostic tests for the last six months of treatment."  (Id. at SAR000249-250)  Ms. Cohen was asked to complete an "Attending Physician's Statement" and "Estimated Physical Abilities" form, including "current office and/or chart notes, along with any documentation you may have including labs, bloodwork, x-rays and the results of any other diagnostic tests for the last 12 months of treatment." (Id. at SAR000248)  Broadspire did not contact either Dr. Patil or Dr. Langanella.

It appears from the record that Ms. Cohen and Dr. Carberry, but not Dr. Rubin, responded to Broadspire's requests for information.  With respect to "Cognitive Functioning," Dr. Carberry reported that Sarlo was able to apply attention and concentration for 15-30 minutes but that the span "varies- need to keep him focused" and that "anxiety interferes with his reasoning; he tends to forget what he is saying mid-sentence." (Id. at SAR000254)  When asked about Sarlo's memory functions and ability to perform basic mathematical operations, Dr. Carberry answered, "see neuro psych report of Dr. Lazarus" but the report

6

was not included.  (Id.)  It is not clear from the record what information Ms. Cohen provided specifically in response to Broadspire's August request.[5]

On September 24, 2003, Dr. Donald Rose, M.D., a neuro-psychologist, reviewed Sarlo's file in order to answer the question: "Is the claimant totally disabled from his own or any occupation base [sic] on the medical provided [sic]?  If not what additional documentation is needed?"  (Id. at SAR000289)  The General Peer Review conducted by Dr. Rose was based on Sarlo's Long Term Disability Questionnaire, Dr. Carberry's records, Ms. Cohen's "current medical notes" and Sarlo's job description. (Id.)

In his review, Dr. Rose summarized the information provided by Sarlo and the two health care providers, noting that Ms. Cohen had recommended additional speech / language and cognitive therapy "specifically for problems associated with attention /concentration, memory, decision making, organization, abstract reasoning, auditory processing, reading comprehension and retention, and verbal and written expression."  (Id. at SAR000290)  With respect to Dr. Carberry's records, Dr. Rose noted Sarlo's self-reported "impairment in cognitive and emotional functioning" and specifically noted that although

---

[5]  The record contains numerous evaluations, reports and letters from Ms. Cohen spanning from late 2001 through March, 2003.

7

"mention of a neuropsychological report is made" there is "no psychometric testing to substantiate these impressions." (Id.)

Dr. Rose concluded:

the medical information provided and reviewed does not demonstrate objective evidence of impairment which would preclude the claimant from performing the essential elements of any occupation from a neurological standpoint. What would be most helpful in determining this case would be obtaining the aforementioned neuropsychological report and raw test data, or a obtaining current neuropsychological examination to determine his present neurocognitive status and extent of disability. Notes from his treating neurologist and psychiatrist would also be helpful.

(Id.)

Accordingly, by letter dated December 4, 2003, Broadspire asked Sarlo for additional medical documentation supporting his continued disability status. The letter closely paraphrased the substantive portions of Dr. Rose's report, stating:

Long Term Disability Questionnaire completed by you on July 3, 2003 notes memory and concentration problems as what prevent you from performing any gainful employment . . . [the] Behavioral Health Clinician Statement, completed by Hugh Carberry, Ph.D., August 8, 2003 notes impairment in cognitive and emotional functioning, and mention of a neuropsychological report is made. However, there is no psychometric testing to substantiate these impressions. The medical information provided and reviewed does not demonstrate clinical evidence of impairment which would preclude you from performing the essential elements of any occupation from a neuro-psychological standpoint.
    In summary, we have determined that, based on our present information, the medical data provided by your physician does not support that you are disabled from your own or any occupation.

8

>       Therefore, you will need to submit any additional
> medical documentation you may have which supports
> that you remain disabled from your own or any
> occupation as defined by your Policy.  Additional
> documentation would be obtaining the
> aforementioned neuropsychological report and raw
> test data, or obtaining a current
> neuropsychological examination to determine your
> present neurocognitive status and extent of
> disability.  Notes from your treating neurologist
> and psychiatrist would also be helpful. . . .
>       Please forward any additional information to
> our office within 30 days. . . If you are able to
> submit any additional objective documentation, we
> will reconsider our medical review of your file.
> . . . This documentation must be returned to our
> office by **January 6, 2004.**

(Id. at SAR000293)(bold typeface in original)

Sarlo responded by undated letter[6] stating that Broadspire

should expect to receive "updated reports from: Lisa Cohen, Dr.

Carberry, Dr. Rubin, [and] Dr. Lazarus."  (Id. at SAR000299) He

also wrote, "I am asking to allow for time to receive these

reports for your further determinations."  (Id.)  However, by

January 16, 2004-- the date when Dr. Rose re-reviewed Sarlo's

file-- only updated records from Dr. Carberry had been received.[7]

Thus, Dr. Rose again noted that:

>       [t]reatment notes and letter submitted by Dr.
> Carberry, make mention of cognitive problems, but
> these are self-reported by the claimant.  There is

---

[6]  The envelope in which the letter was apparently sent bears an internal office date stamp (not a postmark) of January 6, 2004.

[7]  An in-person Employability Assessment of Sarlo was also conducted by Broadspire.  Broadspire determined that Sarlo was capable of performing the occupations of "Sales Telephone Service," "Sales Agent Insurance," and "Communications Consultant."  (Defs. Ex. B at SAR000320-325)

>no neuropsychometric examination performed or
>objective data specifying neurocognitive
>dysfunction. . . . I again recommend a comprehensive
>neuropsychological examination to determine if and
>what neurocognitive deficits this claimant may have.

(Id. at SAR000327)

In mid-February 2004, Broadspire sent Sarlo a termination letter stating, "[t]here is no documented medical evidence of a functional impairment, which would preclude you from performing the essential elements of your own or any occupation.  Therefore, your benefits will terminate effective February 29, 2004."  (Id. at SAR00033)  The letter further advised that Sarlo may file an appeal from the determination, and recommended that if he were to pursue an appeal, he should submit "current medical documentation" including "data such as diagnostic test results."  (Id.)  The letter specifically stated "[a]dditional documentation could be but [sic] not limit [sic] to a comprehensive neuropsychological examination."  (Id.)

Sarlo appealed the termination.  On August 12, 2004, Sarlo's attorney submitted a letter brief in support of Sarlo's appeal. Attached as exhibits to the letter were: the neuropsychological report of Dr. Lazarus, dated August 29, 2001; the Speech-Language & Cognitive Discharge Summary report of Ms. Cohen, dated April 21, 2004; and the neuropsychiatric report of Dr. Rubin, dated June 22, 2004.

Dr. Lazarus's report describes several "evaluation

10

procedures" he performed on Sarlo a few months after the
accident, including the Wechsler Memory Scale-III, Paced Auditory
Serial Addition Test, Peabody Picture Vocabulary Test-III and
Wechsler Adult Intelligence Scale-III.  (Id. at SAR000726) Dr.
Lazarus summarized his findings as follows:

> Mr. Sarlo is currently functioning intellectually in
> the Average range relative to peers.  There was a
> significant difference noted between verbal and
> visual-spatial abilities, with the latter being
> stronger.  Memory was overall Average for his age,
> and was not overall significantly weaker than would
> be expected given his intelligence as assessed on
> the WAIS-III.  His performance on immediate memory
> tasks using an auditory-verbal modality was,
> however, significantly weaker than expected given
> his intelligence as assessed on the WAIS-III. . . .
> Higher order attention, using an auditory-verbal
> modality was significantly impaired.  Executive
> functioning was intact.  Language functioning was
> intact.  Emotionally, Mr. Sarlo is reportedly
> experiencing significant distress, specifically
> depression and symptoms of anxiety . . . . his
> emotional symptoms are consistent with and
> Adjustment Disorder with Mixed Anxiety and Depressed
> Mood which likely contributes to at least some of
> the cognitive impairments Mr. Sarlo complained [of]
> (e.g. attention, auditory memory).

(Id. at SAR000728-729)

> Ms. Cohen's report concluded:

> it remains this therapist's professional opinion
> that Mr. Sarlo be considered for disability benefits
> under the provisions of the Social Security Act due
> to the extent of persistent language and cognitive
> impairments resultant from his brain injury
> including problems with: attention/concentration,
> memory, decision making, organization, abstract
> reasoning auditory processing, reading comprehension
> and retention, verbal and written expression.  These
> persistent impairments would not allow him to
> adequately perform on work related mental

11

activities.

(Id. at SAR000733)

Dr. Rubin's report summarized Mr. Sarlo's medical history and treatment from the date of the accident to the present, relying on Sarlo's past medical records and Sarlo's own reported problems.  The section of Dr. Rubin's report entitled "Neuropsychiatric Evaluation" stated, in relevant part:

> [Sarlo] had numerous subjective complaints, and on
> reviewing them 'from head to toe,' I learned he
> still had persistent headaches and cognitive
> deficits, especially for reading and recalling
> materials.  He says, 'I can watch a television show,
> one person talks to another, and the other one
> answers, and then I don't remember what the first
> one said.'  When he tries to read and turns a page
> he will not remember what was on the previous page
> and he will get confused and frustrated and
> irritable.

(Id. at SAR000738) Dr. Rubin's diagnoses were "multiple orthopedic injuries; post-concussion syndrome (post-traumatic brain injury) with amnestic, cognitive and personality changes; [and] post-traumatic stress syndrome with depressed mood."  (Id.) His opinion states,

> [b]ased on this examination and review of the
> records available I conclude, in all medical
> certainty, there is objective demonstrable medical
> evidence of orthopedic, neurologic and
> neuropsychiatric impairments causally related to the
> motor vehicle accident of July 6, 2001, all of which
> lessen to a material degree the working ability and
> conduct of the normal pursuits of life in the above
> individual because of the manner in which they
> restrict the functioning of his body and its members
> as described in the above narrative.

12

. . .

>	In summary, [Sarlo] has a very complex
>	neuropsychiatric impairment which I place primarily
>	in the category of a Post-Traumatic Stress Syndrome,
>	because it was caused by a potentially fatal
>	traumatic event, superimposed on a post-concussive
>	personality disorder of mood manifested by
>	depression as well as his amnestic and cognitive and
>	speech and visual impairments, all of which arose
>	from the trauma to the head and his emotional
>	reaction.

. . .

>	I take such a dim view that [Sarlo] would be a
>	successful candidate for rehabilitation that I
>	suggest some consideration be given to the notion
>	that he is 100% permanently and totally disabled and
>	unemployable due to the motor vehicle accident of
>	July 6, 2001.

(Id. at SAR000739)  Other than a summary of the past results of

neuropsychological testing by Dr. Lazarus and a brain MRI

performed in August 2001,[8] Dr. Rubin's report does not include

any diagnostic test results.

   During Broadspire's internal Peer Review Appeal process, Dr.

Elana Mendelssohn, a clinical neuropsychologist, reviewed Sarlo's

entire file (containing over 50 documents).  She summarized Dr.

Lazarus' neuropsychological evaluation report, noting that it

stated Sarlo did not have difficulty with comprehension or

understanding various test instructions but that Ms. Cohen's

evaluation conflicted with Dr. Lazarus's in that regard.  (Pl.

_____

   [8]  According to Dr. Rubin's report, the MRI was "said to be
unremarkable."  (Id. at SAR000735)

13

Ex. C) Dr. Mendelssohn also noted that Dr. Lazarus's report stated that Sarlo's performance during his evaluation was "relative[ly] intact" whereas Ms. Cohen observed "extensive deficits." (Id.)

With regard to the documents submitted in support of Sarlo's Social Security claim, as well as the reports of Dr. Carberry and and Dr. Rubin, Dr. Mendelssohn noted the lack of "examination findings to substantiate" their conclusions and opinions.  (Id.) Specifically with regard to Dr. Rubin's report, Dr. Mendelssohn wrote,

> [t]he most recent documentation is a
> neuropsychiatric evaluation from Dr. Rubin, dated
> 06/22/04.  It appears that Dr. Rubin reviewed the
> claimant's medical and neuropsychological history.
> . . . Dr. Rubin failed to provide specific
> examination findings and behavioral observations of
> the claimant's neuropsychological functioning.
> Rather, it appears that he based his conclusions on
> the claimant's subjective complaints.

(Id.)

Dr. Vaughn Cohan, a neurologist, also independently reviewed Sarlo's entire file during Sarlo's appeal.[9]  Dr. Cohan's peer review states:

> The claimant alleges that he is unable to return to
> work primarily due to ongoing post-traumatic
> cognitive dysfunction.  The claimant underwent a CT
> of the brain in July 2001, which was within normal

_____

[9] Dr. Michael Goldman, whose specialty is physiatry, also reviewed Sarlo's records as they related to physical medicine and rehabilitation. (Defs. Ex. B at SAR001128-1131) Dr. Goldman determined that Sarlo was not entitled to benefits based on any neuromuscular or musculoskeletal dysfunction.

14

limits.  An EEG performed in December 2001 was also
within normal limits.  An MRI of the brain performed
in August 24, 2001 was also normal.  The claimant's
initial neurologic consultation was performed by Dr.
Patil on July 25, 2001 at which time the claimant
was described as alert, oriented to person, place,
and time, with goal oriented thought.  Abstractions
were intact.  He did have attention span and poor
calculations at that time.  The bulk of the medical
records, which are presently available, are in the
form of reports from psychologists and speech
language therapy specialists who have concluded that
the claimant is cognitively unable to return to
work.  It is noted that pervious psychology peer
reviews were performed by Dr. Rose on October 2,
2003 and January 26, 2004 at which time he
determined that the documentation did not support
disability on the basis of impaired condition.  At
this time a follow-up neuropsychology peer review is
to be performed by Elana Mendelssohn, and I would
defer to her interpretation of the
neuropsychological data with respect to work
functionality.  However, I should point out that the
claimant's attorney makes reference to previous
neuropsychological testing which was performed and
at which time the claimant was described as
cognitively impaired and unable to work.  That
examination was performed by Lewis Lazarus, Ph.D.,
on August 29, 2001, and this examination would be
considered outdated with respect to the claimant's
present neurocognitive functionality.  The
examination was performed 1 ½ months after the
claimant's initial accident and head trauma, and it
would not be unusual to find abnormalities which
would be expected to have improved and/or resolved
over time.  A recent neuropsychoatric evaluation was
performed by Richard Rubin, M.D., on June 22, 2004
at the request of claimant's attorney.  He found the
claimant also unable to work due to cognitive and
personality changes, depression, and post traumatic
stress syndrome.  It appears that Dr. Rubin's
opinion is based primarily on a review of prior
medical records and self-reported symptoms as
described by the claimant, but there is no evidence
that the claimant underwent further performance
based quantitative testing.

(Defs. Ex. B at SAR001135-1136)

By letter dated December 13, 2004, Broadspire informed Sarlo
that his appeal was denied, explaining,

> [t]he Appeal Committee found that the submitted
> documents did not have enough sufficient [sic]
> medical evidence (i.e. current records regarding Mr.
> Sarlo's neuromuscular and/or musculoskeletal
> dysfunction, documentation of neurological or
> orthopedic impairment, documentation of continued
> problems in regard to Mr. Sarlo's vision,
> extraocular motility and/or other neurological
> impairment of cranial nerve function, abnormal
> diagnostic tests, current neuropsychological report,
> behavioral observations with the frequency, duration
> and intensity of the symptoms observed, performance
> based tests of psychological functioning with
> standardized scores and results of symptom validity
> measures, current office/consultation notes from the
> period of time in questions [sic] etc.) to
> substantiate significant impairments in functioning
> that would have prevented him from performing the
> essential functions of **any gainful occupation.**

(Id. at SAR000770)(bold typeface in original)

This lawsuit followed.  Sarlo asserts one claim pursuant to
29 U.S.C. § 1132(a)(1)(B).[10]


**II.**

"[S]ummary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party

---

[10]  The statute states, "[a] civil action may be brought . . . by a
participant or beneficiary . . . to recover benefits due to him under the
terms of his plan, to enforce his rights under the terms of the plan, or to
clarify his rights to future benefits under the terms of the plan."

is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*). "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322; Fed. R. Civ. P. 56(e) (A party opposing summary

judgment cannot rest upon the "mere allegations or denials of the adverse party's pleading" but must respond with affidavits or depositions setting forth "specific facts showing that there is a genuine issue for trial.").

When, as here, cross-motions for summary judgment are pending, "the Court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, No. 05-4456, 2006 U.S. App. LEXIS 15607 (3d Cir. June 21, 2006). In ERISA cases such as this, this task is relatively straightforward, as the question presented by both motions is whether or not, based on the undisputed administrative record, Broadspire's decision was arbitrary or capricious. *See id.*

## III.

### A.

Pursuant to Sarlo's LTD policy, Broadspire has "full discretion and authority" to "interpret all policy terms and conditions," including "eligibility for coverage." (Defs. Ex. A at 000378) Thus, the Court will apply an arbitrary and capricious standard of review.[11] *See Firestone Tire & Rubber Co.*

---

[11] Sarlo urges the Court to apply a de novo standard of review, stating that the discretionary language of the Plan is void because it "is prohibited by the regulations of the State of New Jersey." (Pl. Opp./Reply at p. 3) In

*v. Bruch,* 489 U.S. 101, 111-12 (1989); *Abnathya v. Hoffman La-Roche, Inc.*, 2 F.3d 40, 41 (3d Cir. 1993).

However, when, as here, "an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 378 (3d Cir. 2000). Under *Pinto's* "sliding scale" approach, the intensity of scrutiny under the arbitrary and capricious standard increases commensurately with the level of conflict found to exist. *Id.* at 392. To determine the level of conflict, the Court considers: "(1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial

---

support of his argument, Plaintiff relies on a letter written by the Director of New Jersey's Division of Insurance which was published in the "Voice of the Bar" column of the *New Jersey Law Journal* on February 13, 2006. 183 N.J.L.J. 449. The letter was written in response to a previously published op-ed piece criticizing the inclusion of discretionary clauses in plans governed by ERISA. First, such a letter itself is not a law or regulation and cannot invalidate any contractual provision of the Plan. Second, the statutory authorities cited in the letter merely permit the New Jersey Department of Banking and Insurance to "disapprove" a group health insurance policy which has been submitted for approval on the ground that the policy "contains provisions that are unjust, unfair, inequitable, misleading, contrary to law or to the public policy of this State." N.J.S.A. § 17B:27-49. Nothing in the statute voids the discretionary clause in the Plan at issue. Moreover, the Court further notes that Sarlo's Group Insurance Certificate specifically states that it is governed by the laws of Delaware. (Defs. Ex. A at SAR000363) Thus, there is a significant question, not addressed by Sarlo (or Broadspire), whether New Jersey law is even the applicable law on this issue. *See generally Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 470 (3d Cir. 2006) (noting that the district court was correct to look to the law of the state chosen by the contracting parties to govern their agreement in determining whether a provision of the agreement was voided by statute). For all of these reasons, we reject Sarlo's argument that New Jersey law voids the clause at issue.

19

or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction." *Stratton v. E. I. DuPont de Nemours & Co.*, 363 F.3d 250, 254 (3d Cir. 2004) (citing *Pinto*).

A slightly elevated review is appropriate in this case. The Court will assume that there was some sophistication imbalance between Sarlo and Broadspire. *See Id.* at 254 (assuming that individual employee had no reason to have ERISA or claims experience, whereas the plan administrator "had numerous such claims"). With respect to information accessibility, Sarlo asserts that Broadspire failed to adequately communicate with Sarlo regarding the information it required in making his benefits determination. While such an assertion, if true, might demonstrate the requisite information imbalance to further heighten this Court's scrutiny, this assertion is contradicted by the documentary evidence in the record, thus no increase in scrutiny is warranted by this factor. As to the last two factors, Sarlo has made no allegations, and there is no evidence in the record, regarding the exact financial arrangement between Broadspire and Verizon[12] or Verizon's structural or financial deterioration, therefore increased scrutiny is not warranted based on these factors. *See Marciniak v. Prudential Fin. Ins.*

---

[12]   Neither party provides the Court with a copy of the Group Policy between Verizon and Lumbermans Mutual Casualty Company or any other information regarding the precise relationship between these companies.

20

*Co. of Am.,* No. 05-4456, 2006 U.S. App. LEXIS 15607 (3d Cir. June 21, 2006) ("The burden of proof is on the claimant to show that a heightened standard of review is warranted in a particular case.").

"Demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits" also justifies heightened scrutiny, *see Kosiba v. Merck & Co.,* 384 F.3d 58, 66 (3d Cir. 2004), however, as discussed below, Sarlo's assertions of bias and irregularity are not supported by the record.

Accordingly, consideration of all these factors supports only a slightly heightened arbitrary and capricious review.  The Court now turns to the claims process to determine whether Broadspire's decision "is clearly not supported by the evidence in the record" or whether it "has failed to comply with the procedures required by the plan."  *Stratton*, 363 F.3d at 256. "A reviewing court may not substitute its judgment for that of the [defendant].  Rather, it must determine if the [defendant's] decision was without reason or unsupported by substantial evidence."  *Hunter v. Fed. Express Corp.*, 169 Fed. Appx. 697, 703 (3d Cir. 2006) (citing *Abnathya*, 2 F.3d at 45).

21

B.

(1)

Sarlo asserts that Broadspire "grossly mishandled" his LTD claim.  In support of this contention, Sarlo relies heavily on the handling of a single neuropsychological report, authored by Dr. Lazarus on August 29, 2001 ("Lazarus report").  Sarlo asserts that Broadspire "failed to obtain and then ignored" the Lazarus report, therefore Broadspire's decision to terminate Sarlo's benefits was arbitrary and capricious.  Sarlo's assertions are contradicted by the record.

In Sarlo's initial LTD benefit application, Dr. Lazarus was identified as a treating health care provider.  While there is no evidence that Dr. Lazarus' report was ever received or reviewed by Broadspire during the initial application process, Broadspire determined that Sarlo was eligible for benefits under the operative definition of disability.  Accordingly, Sarlo was granted benefits for the initial two-year period.[13]

When the time came to reevaluate whether Sarlo's disability fit the total disability definition applicable beyond the initial two year period, Broadspire sent another application packet. This time, Dr. Lazarus was not among the health care providers

---

[13]  Sarlo does not challenge this favorable determination as arbitrary or capricious.  Thus Broadspire's alleged failure to consider the Lazarus report at this stage, is unremarkable.  Moreover, as explained *infra*, any error associated with the initial absence of the Lazarus report in Sarlo's file was cured by the time Sarlo's appeal was considered.

identified by Sarlo.  Pursuant to the LTD policy, it was Sarlo's responsibility to provide Broadspire with the information it required to make a disability determination.  Thus, it was Sarlo's failure, not Broadspire's, that resulted in the Lazarus report's omission from this phase of the benefits determination.

Indeed, once Broadspire became aware of the omission through a reference made by Dr. Carberry's report, Broadspire wrote to Sarlo, explaining the lack of medical evidence and specifically identified the type of documentation Sarlo should provide: "[a]dditional documentation would be obtaining the aforementioned neuropsychological report and raw test data, or obtaining a current neuropsychological examination to determine your present neurocognitive status and extent of disability.  Notes from your treating neurologist and psychiatrist would also be helpful." (Defs. Ex. B at SAR00293)  Sarlo failed to submit the requested information by the deadline.[14]  Thus, it was not arbitrary or capricious for Broadspire to terminate Sarlo's benefits without having reviewed the Lazarus report because it was Sarlo's failures-- his failure to identify Dr. Lazarus as a treating health care provider and to submit neuropsychological records by

---

[14]    Sarlo asserts, without evidentiary support, that he submitted the Lazarus report "before Sarlo's appeal was filed."  The more relevant issue is whether Sarlo submitted the report before Broadspire's decision to terminate his LTD benefits in February 2004.  The undisputed record indicates that Broadspire received the Lazarus report after the termination decision.  (See Defs. Ex. B at SAR001129, SAR001133, SAR001138)

the deadline-- that resulted in its omission from his file.[15]

Alternatively, any alleged error with regard to the Lazarus report that might be attributed to Broadspire was cured during Sarlo's appeal.  The undisputed record demonstrates that Sarlo's attorney submitted the report itself and a lengthy letter brief explaining its findings in support of Sarlo's appeal.  The record also clearly demonstrates that both Dr. Mendelssohn and Dr. Cohan specifically reviewed the Lazarus report and discussed it in their reports.  Thus, contrary to Sarlo's assertions, Broadspire's final termination decision was made with full knowledge and consideration of the Lazarus report.

(2)

Sarlo also challenges the denial of his appeal on several grounds: (1) Broadspire only informed Sarlo after the denial of his appeal that the Lazarus report was insufficient evidence of his continued disability; (2) Broadspire arbitrarily failed to inform and misinformed Sarlo about the type of additional information it required to make the benefits determination; (3) the doctors who peer reviewed Sarlo's appeal applied a more stringent definition of disability than the applicable LTD policy definition; (4) Broadspire arbitrarily required Sarlo to prove

---

[15] Additionally, as further discussed *infra,* the relevance of the Lazarus report (written just a few months after Sarlo's accident) to the determination at hand-- whether Sarlo was sufficiently disabled in late 2003-- was limited at best.

his disability by objective clinical evidence when the LTD policy included no such requirement; and (5) Dr. Mendelssohn was "patently biased" against granting Sarlo benefits.

With respect to Sarlo's first alleged error, Sarlo asserts that Broadspire specifically asked for the Lazarus report but then summarily dismissed it as insufficient on appeal. Sarlo reasons that such actions were arbitrary. The Court disagrees.

Sarlo's argument assumes that Broadspire knew the date and substance of the Lazarus report when Broadspire asked for it. As discussed above, the undisputed facts do not support that assumption. Sarlo failed to provide the Lazarus report before Broadspire's initial termination decision. The Lazarus report was considered for the first time on appeal, therefore no earlier determination of its weight or relevance was possible.

Moreover, Broadspire's explanation for the Lazarus report's inadequacy was entirely consistent with its prior communications with Sarlo. When Broadspire wrote to Sarlo in June 2003, it explained that the initial two year LTD period was coming to a close and Broadspire required "*updated* information" "in order to certify [Sarlo's] *continued* eligibility for benefits." (Id. at SAR000236)(emphasis added)  Then in December 2003, when Broadspire specifically asked for the neuropsychological report referenced by Dr. Carberry, it explained to Sarlo that the additional medical information was required "to determine your

25

*present* neurocognitive status and extent of disability." (Id. at SAR000293)(emphasis added) For a third time in February 2004, in the LTD benefits termination letter, Broadspire stated that if Sarlo wished to appeal, he should submit "current medical documentation" including "data such as diagnostic test results." (Id. at SAR00033)

Thus, Broadspire's rejection of the Lazarus report as outdated was not arbitrary or capricious. The report was simply not what Broadspire had requested from Sarlo and of little relevance to Sarlo's current neurocognitive health in 2004.

Sarlo's second and related alleged error is that Broadspire misinformed him of the additional materials it required to make the benefits determination. Specifically, Sarlo contends that Broadspire: (a) failed to inform Sarlo that Broadspire required a current neuropsychological report; and (b) employed an arbitrary process in denying Sarlo's appeal, as reflected by the denial letter's inadequate articulation of the reasons for the denial.

With respect to the neuropsychological report requirement, Sarlo's contention is refuted by the record. As discussed *supra*, Broadspire repeatedly informed Sarlo that it required documentation from which it could evaluate Sarlo's current level of functioning. Given Sarlo's contention that he continued to suffer from cognitive impairments, an evaluation of his current level of functioning would necessarily be based on a

neuropsychological evaluation conducted more recently than 2001, when Dr. Lazarus evaluated Sarlo.

With respect to the appeal denial letter, the record demonstrates that Broadspire specifically articulated its reasons for the denial and those reasons are supported by substantial evidence.  Though not concisely stated, the appeal denial letter makes clear that Sarlo failed to provide sufficient current and objective evidence in the form of diagnostic test results or symptom validity measures of his continued disability.  These reasons have substantial support in the administrative record. Even at the appeal stage, the most recent diagnostic test results were from 2001-- i.e. they were not current.  While Sarlo's file did contain some current documentation, that documentation was based primarily on Sarlo's self-reported symptoms and contained no current test results.  The appeal denial letter explained as much.  Accordingly, Broadspire's actions were not arbitrary or capricious.

Third, Sarlo asserts that Dr. Mendelssohn and Dr. Cohan arbitrarily applied a standard of disability substantially different than that prescribed by the LTD policy.  The policy states that Sarlo must be "so prevented from performing the Essential Functions of any Gainful Occupation that [his] training, education and experience would allow [him] to perform." (Defs. Ex. A at SAR000365-366) "Essential Functions" are defined

as "functions which are normally required for the performance of
an occupation, and which cannot be reasonably omitted or
modified." (Id. at 000380) "Gainful Occupation" is defined as
"an occupation in which the monthly earnings are equal to or
greater than 60% of your Pre-Disability Monthly Income." (Id.)

    Dr. Mendelssohn completed a Peer Review Appeal Form which
asked her to answer: "based on the documentation submitted for
review, is there evidence of a psychological/cognitive impairment
precluding work in any occupation effective 3/1/04, forward?"
(Def. Ex. B at SAR001140) She concluded that the documentation
"fail[ed] to support impairment for entire time frame" explaining
that "the submitted documentation does not substantiate that the
claimant currently suffers complete limitation of his functional
ability based on his mental status. Therefore, the documentation
does not provide evidence of a neuropsychological impairment
precluding the claimant from working in any occupation effective
03/01/04 forward." (Id. at SAR001141)

    Sarlo takes issue with Dr. Mendelssohn's use of the phrase
"complete limitation of his functional ability," asserting that
Dr. Mendelssohn applied a more restrictive definition of
disability-- a definition that required complete limitation, as
opposed to a limitation that merely precluded him from performing

the essential functions of any occupation.[16]  The Court
disagrees.

Read in context, Dr. Mendelssohn's use of "complete
limitation of functional ability" refers to Dr. Rubin's opinion
that "the claimant is 100% permanently and totally disabled and
unemployable." (Id.) (quoting Dr. Rubin's report)  Dr.
Mendelssohn was asked to determine whether there was sufficient
"evidence of a psychological/cognitive impairment precluding work
in any occupation," which is consistent with the policy's
definition of disability.  In explaining why she concluded there
was not sufficient evidence of a disability, she was required to
evaluate the reports submitted, and in so doing, stated why she
disagreed with Dr. Rubin's conclusions.  The record does not
establish that Dr. Mendelssohn applied a definition of disability
that substantially differed from the policy definition.

Likewise, the record does not establish that Dr. Cohan
applied a different standard of disability.  Dr. Cohan was asked:
"based on the documentation submitted for review, is there
evidence of a functional impairment precluding work in any
occupation effective 3/1/04 forward?"  (Id. at SAR001134)  Dr.
Cohan began his review stating, "this peer review is performed in
consideration of the claimant's functionality for 'any

---

[16]  Specifically, Sarlo argues that Dr. Mendelssohn's standard
"literally re-wrote the policy so that with respect to cognitive problems,
only the severely mentally retarded could qualify for benefits."  (Pls. Reply
at 7)

occupation' effective March 1, 2004." (Id. at SAR001135) After discussing the relevant documentation, Dr. Cohan concluded, "it is my opinion that the documentation submitted fails to demonstrate objective evidence of a functional impairment of sufficient severity and/or intensity as to preclude the claimant from performing work from March 1, 2004." (Id. at SAR001136) This standard does not alter the policy definition of disability, which requires that Sarlo be "so prevented from performing the Essential Functions of any Gainful Occupation." (Defs. Ex. A)

Next, Sarlo asserts that the peer reviewing doctors required objective evidence of disability, thereby arbitrarily adding a term to the policy definition of disability, which says nothing about objective evidence. In support of his contentions, Sarlo relies upon *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997). *Mitchell is* distinguishable.

In *Mitchell*, the claimant sought LTD benefits because he suffered from Chronic Fatigue Syndrome ("CFS"). 113 F.3d at 435. The Third Circuit held that it was arbitrary and capricious to require objective evidence of the *etiology* of the claimant's CFS when his LTD policy said nothing about objective evidence. The Court explained, "[b]ecause the disease, although universally recognized as a severe disability, has no known etiology, it would defeat the legitimate expectations of participants in the Kodak Plan to require those with CFS to make a showing of

30

clinical evidence of such etiology as a condition of eligibility for LTD benefits." *Id.* at 443.   Notably, the Court specifically stated that "in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering." *Id.* at 442-43.

Here Broadspire did not require objective evidence of the etiology of Sarlo's disability.   Unlike the claimant in *Mitchell*, Sarlo's alleged disability resulted from a specific and identifiable trauma-- a car accident resulting in a concussion. Thus, the cause of Sarlo's alleged disability was not an issue. Broadspire required current objective medical data in the form of diagnostic test results, performance based quantitative testing, standardized test scores, and symptom validity measures (see Def. Ex. B at SAR001136; SAR001142).   Because a reasonable person could find such objective evidence helpful in establishing a standard measurement of the extent or severity of Sarlo's symptoms and disability (as opposed to the cause of his disability), requiring such evidence was not arbitrary and capricious.   *See Nichols v. Verizon Communications Inc.,* 78 Fed. App'x 209, 212 (3d Cir. 2003) (requiring objective evidence of CFS *symptoms* was not arbitrary and capricious)(emphasis in original).

Lastly, Sarlo asserts that Dr. Mendelssohn's peer review was

31

arbitrarily based on her own bias against LTD claimants and not on the documentary evidence submitted in support of Sarlo's appeal.  The record does not support this contention.

Sarlo contends that Dr. Mendelssohn's report selectively omits information from Sarlo's medical records that would have supported his claim for benefits.  As an initial matter, the record shows that Dr. Mendelssohn was given Sarlo's entire claim file, which contained over 50 documents.  Thus, the mere fact that she did not discuss every document in the file and chose to summarize others is not, in and of itself, arbitrary and capricious or demonstrative of bias.

Moreover, contrary to Sarlo's assertions, Dr. Mendelssohn's report is not adversarial or one-sided.  Her report critically evaluates the reports of Dr. Rubin and Dr. Lazarus (among others).  Importantly, however, her critical evaluation is reasoned, highlighting apparent inconsistencies in the doctors' conclusions and Sarlo's reported symptoms and performance.  For example, Dr. Mendolssohn stated:

> A neuropsycholgical evaluation completed shortly after this accident [documented in the Lazarus report] did not substantiate the presence of substantial cognitive deficits, rather the claimant's neuropsychological functioning was largely intact.  Yet medical records suggest a decline in the claimant's level of cognitive functioning.  Despite the claimant's relatively intact performance on the neuropsychological evaluation, subsequent documentation reported impairments in expressive and receptive language, memory, sequencing, and emotional functioning. . . .

> Individuals who have been diagnosed with
> postconcussion syndrome typically return to baseline
> functioning within one year of their injury.  Yet,
> the claimant reports worsening of his symptoms which
> have continued over three years since the claimant's
> injury.  Additionally, despite reports of cognitive
> deficits which would interfere with the claimant's
> work capacity, there is an absence of recent
> examination findings to substantiate these opinions.

(Defs. Ex. B at SAR001141)

Accordingly, Dr. Mendelssohn's critical analysis does not support a reasonable inference of bias.  Her evaluation of the documentary evidence is reasoned, not arbitrary, and supported by substantial evidence, as discussed in her report.

## IV.

Based on the foregoing, the Court holds that the undisputed record demonstrates that Broadspire's actions were not arbitrary and capricious or without substantial support in the administrative record.  Accordingly, Broadspire's Motion for Summary Judgment will be granted and Sarlo's Motion for Summary Judgment will be denied.  The Court will issue an appropriate order.


Date: July __11th__, 2006

                                    s/_Joseph E. Irenas_
                                    JOSEPH E. IRENAS, S.U.S.D.J.


33